IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EQUAL EMPLOYMENT )
OPPORTUNITY COMMISSION, )
)
Plaintiff, )
)
v. ) No. 04 C 4353
) Judge Mark Filip
MIDWEST EMERGENCY )
ASSOCIATES, LTD., et al., )
)
Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiff, the Equal Employment Opportunity Commission (the "EEOC" or "Plaintiff"), is suing Defendants, Midwest Emergency Associates, Ltd. ("MEA-Ltd"), Midwest Emergency Associates, LLC ("MEA-LLC"), and Midwest Emergency Associates-Elgin, Ltd. ("MEA-Elgin") (collectively "Defendants"), for alleged violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq. (D.E. 1 at 1.)[1] The EEOC alleges that Defendants unlawfully subjected Dr. Margaret Lynch ("Lynch") to sex discrimination by denying her fair and equal consideration for owner/partner status because of her sex, by removing her from her position as Assistant Director or Acting Assistant Director, and by constructively discharging her. (Id. at 3.) The case is before the Court on Defendants' motion for summary judgment on the basis of several "threshold" issues. (D.E. 13.) For the reasons stated below, the Court respectfully denies Defendants' motion.

---

[1] The docket entries in this case are designated as "D.E. __."

I.   Factual Background[2]

   A.   Corporate Structure of MEA Entities

In 1990, Dr. Daniel Sullivan ("D. Sullivan") formed Sullivan Emergency Associates, Ltd. to provide emergency physician staffing to Ingalls Hospital. (D.E. 14 ¶ 7.) Sullivan Emergency Associates, Ltd.'s name was subsequently changed to MEA-Ltd. (*Id.* ¶ 8.) MEA-Ltd is an Illinois corporation and D. Sullivan is its president. (*Id.* ¶ 1; D.E. 18 ¶ 5.) MEA-Ltd employed Cathy Sullivan ("C. Sullivan") for administrative tasks concerning each of the entities. (D.E. 14 ¶ 50.) D. Sullivan was also assigned administrative tasks and each entity paid a proportionate share of both D. Sullivan's and C. Sullivan's administrative salaries. (*Id.*)

Two of MEA-Ltd's initial physicians were Patrick Connor ("Connor") and Saif Nazir ("Nazir"). (*Id.* ¶13.) In the early 1990's, D. Sullivan gave Connor and Nazir ownership interests in MEA-Ltd. (*Id.* ¶ 14.) The three men considered each other "partners" in MEA-Ltd (*id.*) and all three were officers and directors of MEA-Ltd. (*Id.* ¶ 15.) In 1992 and 1993, D. Sullivan, Connor, and Nazir offered "partnership" in MEA-Ltd to three additional doctors: David Farkas ("Farkas"), Vera Masutti ("Masutti"), and Mark Weissman ("Weissman") (hereafter, collectively referred to as the "Six Original Owners"). (*Id.* ¶ 16.)

On April 10, 1996, the Six Original Owners formed MEA-Elgin to provide emergency physician services to Provena St. Joseph Hospital ("St. Joseph's") in Elgin, Illinois, and Connor became one of MEA-Elgin's officers and a Director. (*Id.* ¶ 26.) When MEA-Elgin began

---

[2] In addressing the Defendants' summary judgment motion, the Court views the record and all reasonable inferences that can be drawn from it in the light most favorable to the EEOC, the nonmovant. *See* Fed. R. Civ. P. 56(c); *Foley v. City of Lafayette, Indiana*, 359 F.3d 925, 928 (7th Cir. 2004).

providing physician services to St. Joseph's, Connor became the Medical Director at the St. Joseph Hospital Emergency Department. (*Id.* ¶ 27.)

Until 1998, all of the physicians associated with MEA-Ltd and MEA-Elgin were independent contractors of such entities. (*Id.* ¶ 51.) In 1998, the physicians became employees of some MEA entity (*id.*); the parties dispute which entity employed the physicians.

In 1999, the Six Original Owners began "merger" discussions with Jim Kolka, Marc Crescenzo, and Mark Gordon, the owners of Aurora Emergency Associates, Ltd. (the "AEA owners" and "AEA," respectively). (*Id.* ¶ 29.) The discussions between the Six Original Owners and the AEA Owners lasted many months and considered a variety of options, including merging the corporate entities into a single corporate entity, but ultimately, the parties decided to have a separate medical entity for each hospital or care center and to facilitate coordination between the related entities through a Management Services Organization ("MSO").[3] (*Id.*)

In 2000, the Six Original Owners and the AEA Owners formed MEA-LLC. (*Id.* ¶ 31.) MEA-LLC was originally intended to be the MSO. (*Id.* ¶ 32.) None of the AEA Owners obtained any ownership interest in MEA-Ltd or MEA-Elgin; instead, they became owners of the newly created entities, including MEA-LLC. (*Id.* ¶ 30.) The Six Original Owners did not obtain any ownership interest in AEA. (*Id.*) When MEA-LLC was formed, it entered into loan agreements with MEA-Ltd and MEA-Elgin. (*Id.* ¶ 33.)

At about the same time that MEA-LLC was formed, John Sullivan ("J. Sullivan") was

---

[3] An MSO is typically an entity owned by a hospital or physician group that provides management services and administrative systems to one or more medical practices. *See* Pam Pohly Associates, Glossary of Managed Care Terms (2005), available at <http://www.pohly.com/terms_m.html>.

offered "partnership" in MEA-LLC; he was not given an interest in MEA-Ltd or MEA-Elgin. (*Id.* ¶ 35.) J. Sullivan brought MEA-LLC an opportunity to provide emergency staffing services to St. Alexius Hospital ("St. Alexius"). (*Id.* ¶¶ 34-35.) The Six Original Owners, the AEA Owners, and J. Sullivan (collectively the "Ten Owners") designated MEA-LLC as the corporate entity servicing the St. Alexius contract. (*Id.* ¶ 36.) MEA Management, LLC ("MEA-Management") was formed in 2001 to serve as the MSO. (*Id.* ¶ 37.)

When MEA-Ltd started operations, it had responsibilities for payroll, insurance, and a 401(k) Plan. (*Id.* ¶ 45.) MEA-Ltd was subsequently designated as the "Common Paymaster" for MEA entities. (*Id.* ¶ 46.) MEA-Ltd issued Lynch's annual W2 forms. (*Id.* ¶ 48.)

MEA-Elgin's bylaws require that the Board of Directors officially meet once per year immediately following the annual meeting of shareholders. (D.E. 18 ¶ 26.) Defendants have not stated that a shareholder meeting ever took place. (*Id.*) After 1996, the shareholders of MEA-Elgin met on only one occasion, September 5, 2002, to remove Connor as a director of the board. (*Id.*) Otherwise, the shareholders signed a memorandum of action each year reelecting certain shareholders as officers and members of the Board of Directors. (*Id.*) In 2003 and 2004, the memorandum of action included a signature line for Connor, who had been voted off the Board in 2002 but remained a shareholder. (*Id.*; D.E. 21 ¶ 26.)[4]

On December 21, 1999, MEA-Ltd and MEA-Elgin jointly executed a promissory note to the Oak Brook Bank ("Bank") in the amount of $500,000. (D.E. 18 ¶ 28.) On September 14,

---

[4] Defendants contend that they satisfied the annual meeting requirement through monthly meetings, at which the Six Original Owners, and later the Ten Owners, "discussed all of the entities and financial issues that we had in common, including matters unrelated to any of the MEA entities." (D. Sullivan Aff. ¶ 38 (referenced in D.E. 21 ¶ 26).)

2000, MEA-Ltd and MEA-Elgin jointly executed a promissory note to the Bank in the amount of $200,000. (*Id.*) On September 14, 2000, MEA-Ltd and MEA-Elgin entered into a Cross Collateral/Cross Default Agreement with the Bank which encompassed not just the loans referenced above, but also loans which each entity had entered into individually. (*Id.*) Between 1996 and 2001, MEA-Elgin owned no real property, medical equipment, or automobiles. (*Id.* ¶ 33.) Initial operating funds for MEA-Elgin were provided by the Bank, which was never an owner of MEA-Elgin. (*Id.*)

    B.    Lynch's Employment with MEA Entities

In 1994, Lynch moved back to Chicago after completing her internship and residency in emergency medicine in Minnesota. (D.E. 18 ¶¶ 1-2.) Lynch, who grew up in the same neighborhood as D. Sullivan and knew him all of her life (D.E. 14 ¶ 52), met with D. Sullivan when she was scouting for job opportunities in Chicago. (D.E. 18 ¶ 2.) During that meeting, D. Sullivan described to Lynch the operation of his medical practice in the Ingalls Hospital emergency room. (*Id.*) Specifically, D. Sullivan told Lynch that he had structured his practice at Ingalls Hospital to offer shared ownership and that it was an eighteen-month path to ownership. (*Id.* ¶ 39.) Lynch did not go to work with D. Sullivan immediately—she worked at Grant hospital for approximately one-and-one-half years. (*Id.* ¶ 3.) In early 1996, Lynch met with D. Sullivan and Nazir, and Lynch told them that she was considering taking a job at Northwestern Hospital. (*Id.* ¶ 40.) D. Sullivan and Lynch discouraged Lynch from going to Northwestern because she would never be able to become an owner there. (*Id.*)

In March or April 1996, Lynch met with Connor and D. Sullivan as part of D. Sullivan's efforts to recruit doctors for the contract he was negotiating with St. Joseph Hospital. (*Id.* ¶ 41.)

At this meeting, Connor and D. Sullivan discussed with Lynch the possibility that she would be offered partnership status if her performance and dedication warranted such an offer. (*Id.*) D. Sullivan told Lynch that if she came to work for him, that she would be offered partnership and that she could become the assistant director in the future. (*Id.*) The parties dispute whether D. Sullivan specified the entity in which Lynch would receive an ownership interest. (*Id.* ¶ 42; D.E. 21 ¶ 42.)

On April 6, 1996, D. Sullivan sent Lynch a written offer of employment ("the offer letter"). (D.E. 18 ¶ 7.) The offer letter stated that Lynch "will have an independent contractor relationship with [MEA-Ltd]." (*Id.*) The offer letter did not mention the possibility of ownership; Lynch did not object to the terms in the offer letter. (D.E. 14 ¶¶ 58-59.) At the time the offer letter was written, MEA-Elgin did not exist. (*Id.* ¶ 26.)

The parties agree that Lynch was staffed at St. Joseph Hospital between 1996 and 2001 and was under Connor's supervision. (D.E. 18 ¶ 18.) The parties dispute which of the three MEA entities was Lynch's employer during this time period. Defendants maintain that Lynch's employer was MEA-Elgin while Plaintiff asserts that Lynch's employer was MEA-Ltd.

In or about 1997, Lynch told Connor that she was being treated differently than male doctors in that she was asked to work more undesirable shifts and she received lesser reimbursements for travel expenses. (*Id.* ¶ 43.) Connor told her that the differences in reimbursements were due to the fact that she was going to become a partner, while the male doctors were not. (*Id.*) Connor told Lynch of his repeated efforts to get Lynch some sort of ownership interest. (*Id.* ¶ 44.)

In September 1999, the Six Original Owners considered Lynch's request for ownership.

6

The notes of the meeting stated that they would come up with 3 to 5 possibilities for offering Lynch an ownership stake. (D.E. 14 ¶ 70.) In February 2000, the Six Original Owners again considered Lynch's request for ownership. (*Id.* ¶ 71.) The notes from the meeting indicate that the majority voted against making Lynch a partner at that time and that they tabled the issue until they completed the merger with AEA and worked out a system to add new partners. (*Id.*) On June 22, 2000, the Six Original Owners and the AEA Owners considered Lynch's request for ownership. (*Id.* ¶ 73.) A motion that Lynch could become a Class A partner if she would move to within 30 minutes of the hospital was proposed, put to a vote, and defeated. (*Id.*)

In the fall of 2000, the Ten Owners created a "Partnership Track" in the planned MSO for up to fifteen physicians. (*Id.* ¶ 75.) Under the Partnership Track, physicians would be required to buy into the "partnership" and would be eligible for a 1% interest. (*Id.*) Lynch was one of the physicians considered for the Partnership Track; her offer included an exemption from the buy-in requirement and immediate vesting of her ownership interest. (*Id.* ¶ 76.) The parties disagree about how the parties reacted to Lynch's dissatisfaction with this proposal (D.E. 17 ¶ 77), but it is clear that the proposal was not instituted at that time.

In late March or early April 2001, Lynch met with D. Sullivan to discuss a 3.5% ownership offer. (D.E. 18 ¶ 36; D.E. 14 ¶ 80.) No one else who was considered for the Partnership Track received an offer of 3.5% interest. (*Id.* ¶ 79.) While Lynch did not accept this offer, D. Sullivan told her that it had been a good meeting and that he would reconsider the offer. (D.E. 18 ¶ 36.) Lynch believed that she was in active negotiation with D. Sullivan (and the other owners) with respect to the level of her ownership. (*Id.* ¶ 37.)

On April 10, 2001, D. Sullivan wrote Lynch a letter ("April 10 letter") which purported to

be "on behalf of the Board of Midwest Emergency Associates." (D.E. 14, Lynch Dep., Ex. 8.) D. Sullivan mailed the letter on April 13, 2001 and Lynch received it on April 16, 2001. (D.E. 18 ¶ 34.) The April 10 letter informed Lynch that the offer of 3.5% ownership was "extinguished" and that he was "disappointed that [Lynch] will not be joining us as an owner and partner in MEA." (D.E. 14, Lynch Dep., Ex. 8.) It also stated that "We will be naming another Assistant Director in July and will discontinue your role as Assistant Director and your [$3000/mo.] stipend at that time." (*Id.*) The April 10 letter also indicated that "at the conclusion of [Lynch's] Assistant Directorship MEA will provide you with a bonus of ten thousand dollars ($10,000)." (*Id.*) It concludes with D. Sullivan expressing his regret that "the ownership relationship has not worked out." (*Id.*)

Lynch interpreted the letter as a withdrawal of all offers of partnership and as a demotion, with a commensurate loss in compensation. (D.E. 18 ¶ 34.) Yet Lynch was not terminated—the letter included two written employment contracts if Lynch "wish[ed] to continue working at Provena St. Joes." (D.E. 14, Lynch Dep., Ex. 8.) This was the first time Lynch received a written contract from an MEA entity. (D.E. 18 ¶ 21.) Lynch did not sign the contracts. Instead, she resigned effective April 30, 2001 (D.E. 14 ¶ 87); the EEOC maintains her resignation was the result of a constructive discharge. (D.E. 17 ¶ 87.)

Lynch filed a completed Charge Questionnaire with the EEOC on February 6, 2002, which the EEOC treated as a Charge and to which it assigned a Charge number. (D.E. 18 ¶ 35.) The following day, the EEOC sent a Notice of Charge to "Midwest Emergency Associates." (*Id.*) The EEOC received Lynch's perfected Charge on February 8, 2002. (*Id.*)

Lynch's Charge claimed that the treatment of owner/partner status and her removal from

8

the position of assistant director involved and constituted discrimination on the basis of sex and also pregnancy discrimination. (D.E. 14, EEOC Charge at 1.) Lynch bore three children while she worked at St. Joseph Hospital—the first in September 1997, the second in December 1998, and the third in May 2000. (*Id.* ¶ 88.)

C.   EEOC Investigation

Jennifer Michaels ("Michaels") is an EEOC investigator who conducted interviews as part of EEOC's internal investigation of Lynch's allegations. (*Id.* ¶ 103.) Michaels is not an attorney. (D.E. 18 ¶ 50.) Defendants at times vaguely imply but do not meaningfully allege that Michaels was working at the direction of an EEOC attorney. (*See id.*; D.E. 13 at 18-19.)

The EEOC never told Defendants that it desired to interview Connor and never sought permission to do so. (D.E. 14 ¶ 104.) Nonetheless, during the course of the investigation, Michaels interviewed Connor. Michaels first attempted to directly contact Connor on June 27, 2002 (*Id.* ¶ 103(e)), and her first conversation with Connor was the following day. (*Id.* ¶ 103(f); D.E. 18 ¶ 49.) However, Defendants maintain that Michaels had indirect contact with Connor prior to that date, using Lynch as a go-between. (D.E. 21 ¶ 49.)

Connor left his position at St. Joseph no later than June 18, 2002. (D.E. 18 ¶ 48.) However, Defendants maintain that Connor continued to serve on MEA-Elgin's Board of Directors throughout 2002. (D.E. 21 ¶ 48.) Furthermore, Defendants maintain that the EEOC received documents from Connor that are protected by the attorney/client privilege. (D.E. 14 ¶ 103(g).)

II.  Standard of Review

Summary judgment is proper where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmovant cannot rest on the pleadings alone, but must identify specific facts, *see Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a scintilla of evidence to show a genuine triable issue of material fact. *See Murphy v. ITT Educ. Servs., Inc.*, 176 F.3d 934, 936 (7th Cir. 1999) (citation omitted). The Court views the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmovant. *See* Fed. R. Civ. P. 56(c); *Foley v. City of Lafayette, Indiana*, 359 F.3d 925, 928 (7th Cir. 2004).

III. Discussion

Defendants have moved for summary judgment on several "threshold" issues: (1) Lynch failed to timely file an EEOC Charge with respect to her partnership/ownership claims; (2) Lynch's employer was not an "employer" for the purposes of Title VII; (3) the withdrawal of an offer of partnership is not an adverse change in the "terms, conditions, and privileges of employment"; and (4) the EEOC's alleged improper interview of Connor warrants the Court disqualifying the EEOC from the case, which would result in its dismissal, although Lynch would have leave to file after receiving a right to sue letter.

A. Timeliness of The EEOC Charge

Title VII prohibits, *inter alia*, employment discrimination based on sex in hiring or firing, in compensation, and in terms, conditions, or privileges of employment. 42 U.S.C. ¶ 2000e *et seq.*, as amended. A discriminatory change in the "terms, conditions, or privileges of employment" must be materially adverse to give rise to Title VII liability. *Crady v. Liberty Nat'l*

10

*Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* While a material change need not be quantifiable, *see Collins v. State of Illinois*, 830 F.2d 692, 703-04 (7th Cir. 1987), the action "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Fortier v. Ameritech Mobile Communications, Inc.*, 161 F.3d 1106, 1111 n.7 (7th Cir. 1998). Discriminatory acts that have minimal tangible consequences are not actionable under Title VII. *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998).

Title VII requires aggrieved individuals to file a charge with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). In a deferral jurisdiction, such as Illinois, this period is extended to three hundred days. *See id.*; *Mohasco Corp. v. Silver*, 447 U.S. 807, 814 n.16 (1980). The period for filing a charge with respect to a "terms, conditions, or privileges of employment" claim begins to run from the date the employee becomes aware of the adverse employment action. *Del. State Coll. v. Ricks*, 449 U.S. 250, 256-58 (1980) (clock runs from the date plaintiff notified of the adverse change); *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990); *Colgan v. Fischer Scientific Co.*, 935 F.2d 1407, 1415-21 (3d Cir. 1991). The time limits for filing an EEOC charge are not jurisdictional, so the time requirements are subject to waiver, estoppel, and equitable tolling. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982).

Defendants' timeliness argument is premised upon the notion that Lynch alleges that she suffered three discrete adverse employment actions: the "lowball" offer of 1%, the subsequent

11

offer of 3.5%, and the rescinding of all offers of ownership. (*See* D.E. 20 at 10-11.) But this is not Plaintiff's theory of the case. The EEOC claims that the April 10 letter, in which Defendants rescinded all offers of ownership, is the adverse employment action that gives rise to this claim. (D.E. 19 at 10; D.E. 21 ¶ 34.) Defendants do not dispute (for present purposes, at least) that Lynch received the letter rescinding all offers of ownership on April 16, 2001 and that she filed a charge with the EEOC less than 300 days after the receipt of the letter. (D.E. 18 ¶¶ 34-35.)

Defendants maintain that the April 10 letter was not an adverse employment action because once Lynch suggested that she should receive a higher percentage, she rejected the 3.5% offer, and consequently, the April 10 letter did not rescind anything. (D.E. 20 at 10-11.) However, there is a triable issue on whether the contract negotiations were ongoing such that the alteration of the "terms, conditions and privileges" of Lynch's employment had not yet occurred. Lynch maintains that after the meeting at which Lynch suggested she should receive more, Sullivan told Lynch that he would reconsider Defendants' offer. (D.E. 18 ¶ 36.) This alleged promise led Lynch to believe that she was still involved in active contract negotiations with Defendants. (*Id.* ¶ 37.) This evidence, if credited by the jury, would indicate that the change in the "terms, conditions, and privileges" of Lynch's employment did not occur until Lynch received the April 10 letter, in which Defendants made a final decision that "the ownership relationship has not worked out." (D.E. 14, Lynch Dep., Ex. 8.)

Defendants argue that Lynch cannot "extend the date of an alleged discriminatory act by talking about it." (D.E. 20 at 13.) But the clock does not start running at the time of the first discriminatory act of any sort—it runs from the point that the employee is aware that the "terms, conditions, and privileges" of her employment relationship have been materially altered. *See*,

*e.g., Ricks*, 449 U.S. at 256-58. Defendants cite *Mitilinakis v. Chicago*, 735 F. Supp. 839 (N.D. Ill. 1990), but that case is inapposite because the plaintiff suffered an adverse employment action when she was initially denied reinstatement in December 1985, not at the time her last request for reinstatement was denied. *Id.* at 840. For similar reasons, *Minter v. CSX*, No. 01 C 4794, 2002 WL 99734 (N.D. Ill., Jan. 25, 2002), is of no assistance to Defendants' argument.

B. "Employer" for purposes of Title VII

Defendants move for summary judgment on the grounds that MEA-Elgin, who Defendants maintain was Lynch's employer, was not an "employer" for the purposes of Title VII because it did not have fifteen or more employees. (D.E. 13 at 11-12.) Plaintiff may demonstrate that Lynch was covered by the statute in multiple ways, and Defendants have failed to demonstrate the absence of a material issue of fact with respect to at least two of the "pathways" to Title VII coverage. First, on the basis of the tax records, employment records, and Defendants' representations (*see, e.g.*, D.E. 18 ¶¶ 8-11, 13-15, 18-19), a jury could plausibly find that Lynch was employed by MEA-Ltd rather than MEA-Elgin. If a jury found that Lynch was employed by MEA-Ltd, then Defendants are covered by Title VII, as they have admitted that MEA-Ltd is an employer for the purposes of Title VII. (*See* D.E. 14 ¶ 22.) Second, the EEOC has provided evidence, if credited, could support piercing MEA-Ltd's corporate veil. (D.E. 18 ¶ 23-29, 31-33). While the question is a close one, a reasonable jury might plausibly find a unity of interest between MEA-Ltd and MEA-Elgin that would warrant aggregating their respective employees for the purpose of Title VII, especially since that the applicable test for unity of interest is a multi-factor balancing test in which no factor is dominant. *See, e.g., Jackowski v. Seoco, Inc. N.*, No. 98 C 50337, 2001 WL 709485 at *1 (N.D. Ill. June 22, 2001).

C. Partnership Offers as "Terms and Conditions" of Employment

Defendants argue that they are entitled to summary judgment on "the three ownership issues" (denial, 1% and 3.5%) because "ownership was never a term, condition or privilege of Lynch's employment." (D.E. 13 at 15.) Specifically, Defendants argue that: (1) Lynch did not receive a clear offer of ownership; (2) ownership was not a requirement for Lynch's job or employment-related benefits; (3) there was no custom, practice or policy of elevating employees to ownership. (*Id.* at 17.)

*Hishon v. King & Spaulding, LLC*, 467 U.S. 69 (1980), teaches that when "the underlying employment relationship is contractual . . . the terms, conditions, or privileges of employment clearly include benefits that are part of an employment contract." *Id.* at 74. *Hishon* further counsels that "if the evidence at trial establishes that the parties contracted to have [the employee] considered for partnership, that promise clearly was a term, condition or privilege of her employment. Title VII would then bind [the employer] to consider [the employee] for partnership . . . without regard to [her] sex." *Id.* at 75. There is a material unresolved issue with regards to the existence of an oral agreement between Lynch and Defendants that promised fair consideration for partnership in an MEA entity if she continued to perform satisfactorily—*i.e.*, consideration without the influence of sex discrimination. Plaintiff has set forth facts that make it possible for a jury to fairly determine that Lynch would not have accepted MEA's offer nor would she have continued to work at MEA were it not for the understanding that she would ultimately receive fair consideration for such a partnership interest. (*See, e.g.*, D.E. 18 ¶¶ 39-41, 43-45.) Defendants' brief merely creates a triable issue of fact on this point; it does not establish that, as a matter of law, no contractual term or understanding about fair partnership consideration

14

existed between Lynch and MEA. Furthermore, because the EEOC's theory is based in contract, it is immaterial that ownership was not a requirement of Lynch's employment or that the MEA entities did not have a custom, practice, or policy of providing ownership opportunities. *See Hishon*, 467 U.S. at 75.

D. Disqualification

Defendants seek to have the EEOC disqualified on the basis of allegedly unethical conduct. (D.E. 13 at 18.) The result would be dismissal of the action, because the EEOC is not only the attorney but also the Plaintiff in this matter. (*Id.* at 19-20.) Disqualification is "a drastic measure which . . . serves to destroy a relationship by depriving a party of representation of their own choosing." *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 721 (7th Cir. 1982). *Freeman*'s concern about the drastic effects of disqualification is even greater in the instant matter, where the consequence of disqualification is the dismissal of a federal agency's civil rights action. A district court has wide discretion concerning whether to impose sanctions and, if so, what the sanctions should be in order to uphold the applicable rules of ethics; a district need not turn a blind eye to the possibility of lesser sanctions than disqualification in trying to strike an appropriate balance if an ethical violation were shown.

Defendants claim that an EEOC investigator violated § 23.6(c) of the EEOC Compliance Manual when he interviewed Connor without informing Defendants about the interview. (D.E. 13 at 18.) However, caselaw appears to suggest that the guidelines are not binding law and do not create any enforceable rights—*see, e.g., Sunbeam Appliance Co. v. Kelly*, 532 F. Supp. 96, 99 (N.D. Ill. 1982)—and Defendants cite no authority suggesting that the EEOC guidelines are enforceable by the subjects of an EEOC investigation. Furthermore, the Compliance Manual

15

merely states that a spokesperson or attorney "may be present." (D.E. 14, Michaels Dep., Ex. 5.) Third, even if the Compliance Manual consisted of rules rather than guidelines, EEOC's failure is excusable as harmless error "except upon a showing of substantial prejudice to the complaining party." *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 539 (1970) (quoting *NLRB v. Monsanto Chem. Co.*, 205 F.2d 763, 764 (8th Cir. 1953)). Defendants suggest that they could have forestalled this suit if it had been notified of the interview during the investigatory process, but it is pure conjecture that the EEOC's decision to sue was influenced by the "superficial credence" that Defendants explain (D.E. 20 at 14) Connor's statements gave to Lynch's allegations. Lastly, any injury caused by disclosure of privileged information can be redressed short of disqualification and dismissal.

Defendants cite to Local Rule 83.54.2, which prohibits an attorney from communicating or causing another person to communicate with a represented party without the prior consent of the party's counsel. This rule would not appear to apply to the instant matter because the EEOC investigator who conducted the allegedly-improper interview was not an attorney (D.E. 15 at 15) and Defendants do not argue or set forth evidence that an EEOC attorney "caused" the investigator to conduct the interview.

## CONCLUSION

For the reasons stated above, the Court respectfully denies Defendants' motion for summary judgment on the threshold issues. (D.E. 13.)

So ordered.

*Mark Filip*
Mark Filip
United States District Judge
Northern District of Illinois

Date: February 27, 2006