IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| MIDWEST EMERGENCY ASSOCIATES, LTD., et al., | )<br>)<br>) No. 04 C 4353 |
| Defendants. | ) |
| MARGARET LYNCH, | )<br>) |
| Plaintiff-Intervenor, | )<br>) |
| v. | )<br>) |
| MIDWEST EMERGENCY ASSOCIATES, LTD., et al., | )<br>)<br>) |
| Defendants. | ) |

## **MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Judge:

In its one-count Amended Complaint, Plaintiff, the Equal Employment Opportunity Commission (the "EEOC"), is suing Defendants Midwest Emergency Associates, Ltd. ("MEA Ltd."), Midwest Emergency Associates, LLC ("MEA LLC"), and Midwest Emergency Associates-Elgin, Ltd. ("MEA Elgin"), for sex discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended. *See* 42 U.S.C. § 2000e *et seq*. Specifically, the EEOC alleges that Defendants improperly considered Plaintiff-Intervenor Margaret Lynch's pregnancies and possible future pregnancies in denying her equal terms and conditions of employment. Before the Court is Defendants' second Motion for Summary Judgment pursuant

to Federal Rule of Civil Procedure 56(c).[1]  For the reasons discussed below, the Court grants in part and denies in part Defendants' motion.

## BACKGROUND

**I.     Defendants & Owners**

Defendant MEA Elgin is an Illinois corporation that provides emergency physician services to Provena St. Joseph Hospital ("St. Joseph Hospital" or "St. Joes") in Elgin, Illinois. (R. 65-1, Defs.' Rule 56.1 Stmt. Facts ¶ 3.)  In 1990, Daniel Sullivan formed Sullivan Emergency Associates, Ltd. – which later became MEA Ltd. – to provide emergency physician staffing to Ingalls Hospital. (*Id.* ¶ 5.)  Two of MEA Ltd.'s initial physicians and early owners were Patrick Connor and Saif Nazir. (*Id*. ¶ 6.)  In the early 1990's, Sullivan, Connor, and Nazir offered ownership interests in MEA Ltd. to David Farkas, Vera Masutti, and Mark Weissman, who are collectively referred to as the "Six Original Owners." (*Id.* ¶ 7; R. 76-1, Pls.' Joint Stmt. Add'l Facts ¶ 4.)  During the relevant time period, Masutti was the only MEA owner who was female. (Pls.' Stmt.  Facts ¶ 7.)

In 1999, the Six Original Owners began discussions with Jim Kolka, Marc Crescenzo, and Mark Gordon – the owners of Aurora Emergency Associates, Ltd. ("AEA Owners") – to

---

[1]  On November 19, 2007, the Executive Committee reassigned this case to the Court. (R. 89-1.)  Prior to reassignment, Defendants filed a summary judgment motion that another district judge denied in a February 27, 2006, Memorandum, Opinion, and Order. (R. 24-1.)  In their prior motion, Defendants disputed which MEA entity was Lynch's "employer" for Title VII purposes.  *See* 42 U.S.C. § 2000e(b).  The court concluded that there were genuine issues of material fact concerning Lynch's employer, as well as whether there was a unity of interest between MEA Ltd. and MEA Elgin.  For purposes of the present summary judgment motion, Defendants assume that Lynch has fulfilled the "employer" requirement under Title VII.  That being said, the Court presumes familiarity with the February 27, 2006, Memorandum, Opinion, and Order.

2

coordinate their business activities. (Defs.' Stmt. Facts ¶ 9.) In 2000, John Sullivan, who was not associated with the Six Original Owners or the AEA Owners, brought an opportunity to provide emergency physician staffing services to St. Alexius Hospital and was offered an ownership interest in MEA. (*Id*. ¶ 10.) There is evidence in the record that no partner joined MEA without being given at least a 5% ownership share in one of the MEA entities. (Pls.' Stmt. Facts ¶ 5; Ex. 78-2, Connor Dep., at 187.)

## II.     Lynch's Initial Employment

In early April 1996, Daniel Sullivan, Connor, and Masutti met with Lynch to discuss a potential physician position at St. Joseph Hospital in Elgin. (*Id.* ¶ 11; Pls.' Stmt. Facts ¶ 1.) Daniel Sullivan mentioned that ownership might be a possibility in the future if Lynch's performance and dedication warranted it. (Defs.' Stmt. Facts ¶ 11; Pls.' Stmt. Facts ¶ 1.) After meeting with Lynch, Daniel Sullivan sent Lynch a letter offering her a position at St. Joseph Hospital. (*Id*. ¶ 14.) After receiving Daniel Sullivan's April 6, 1996, letter, Lynch began working at St. Joseph Hospital's emergency room. (*Id.* ¶ 16; Pls.' Stmt. Facts ¶ 3.) For approximately four of the five years Lynch worked for MEA, she was the Assistant Medical Director of the emergency room. (Pls.' Stmt. Facts ¶ 13.)

## III.    Ownership Decisions

In the fall of 2000, the ten MEA owners created a "partnership track" in a planned Management Service Organization ("MSO") for up to fifteen physicians. (Defs.' Stmt. Facts ¶ 37.) Under this new "partnership track," physicians would be required to buy into the "partnership" and would be eligible for 1% ownership interest. (*Id.*) In January 2001, the MEA owners offered Lynch a 1% ownership interest in MEA LLC. (*Id.* ¶ 38; Pls.' Stmt. Facts ¶ 9.)

3

Lynch did not accept this offer. (Defs.' Stmt. Facts ¶ 38.) In February 2001, Lynch met with Daniel Sullivan to discuss the possibility of Lynch's ownership. (*Id.* ¶ 43.) Lynch testified that at the time of her February 2001 meeting with Sullivan it was "apparent that they were not changing any offer. They kept offering the 1 percent with different contingencies on it. And at that time, I felt I should go ahead and, you know, give it my last best shot I guess." (*Id.*)

On March 22, 2001, the Six Original Owners met and decided to offer Lynch a 3.5% ownership interest. (*Id.* ¶¶ 39, 40; Pls.' Stmt. Facts ¶ 18.) At the end of March 2001, Daniel Sullivan called Lynch to offer her the 3.5% ownership interest. (Defs.' Stmt. Facts ¶¶ 44, 45.) Lynch told Sullivan that she felt the offer was inadequate. (*Id.* ¶ 45.) At the end of their telephone conversation, there was no discussion about the next step. (*Id.* ¶ 46.) After the telephone call, Lynch tried to contact Sullivan about the 3.5% offer, but Sullivan was unavailable and did not return her call. (*Id.* ¶ 47.)

Sullivan sent Lynch a letter dated April 10, 2001, expressing his disappointment with her reaction to the 3.5% offer. (*Id.* ¶ 48.) Sullivan's letter to Lynch reads in its entirety:

> I am writing on behalf of the Board of Midwest Emergency Associates. Approximately two weeks ago the Board extended an offer of ownership to you in the amount of three and one-half per cent of the corporation. Both Dr. Connor and I have spoken to you regarding that offer. You have refused that offer, thus extinguishing the offer. On behalf of both Dr. Connor and myself we are disappointed that you will not be joining us as an owner and partner in MEA.
>
> You have been functioning as Assistant Director at St. Joes for some time and have been reimbursed $3,000 per month. Dr. Connor and MEA have been quite satisfied working with you in that position. The Board has reviewed the St. Joes situation and decided that with Dr. Connor living downtown, the Assistant Director must live within 30 minutes of the hospital. We will be naming another Assistant Director in July and will discontinue your role as Assistant Director and your stipend at that time.
>
> I have enclosed contracts for continued employment with MEA should you wish

> to continue working at Provena St. Joes.
>
> You have recently asked for MEA to pay your disability expenses. As I mentioned in a letter sent last year MEA does not cover that expense. However, at the conclusion of your Assistant Directorship MEA will provide you with a bonus of ten thousand dollars ($10,000).
>
> I am sorry that the ownership relationship has not worked out. You are obviously welcome to stay at St. Joes in a full or part time capacity and we hope that you do.

(Def.'s Stmt. Facts ¶¶ 40, 48; Def.'s Ex. 30, April 10, 2001, letter.) As referenced in the letter, Sullivan attached two draft employment agreements for Lynch to remain as a full-time or part-time contract physician with St. Joseph Hospital. (*Id.* ¶ 49.) Lynch resigned from her employment at St. Joseph Hospital effective April 30, 2001. (*Id.* ¶ 53.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, ___ U.S. ___, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is

5

a genuine issue for trial.'" *Anderson v. Liberty Lobby*, 477 U.S. at 255 (quoting Fed R. Civ. P. 56(e)).

## ANALYSIS

### I. Timeliness Issue

In their first summary judgment motion, Defendants argued that any conduct occurring more than 300 days before Lynch filed her EEOC charge on February 6, 2002, was untimely. Although the Court decided this issue in its previous order, Defendants make timeliness arguments in the present summary judgment motion as well.

Under Title VII, a plaintiff must file an employment discrimination charge with the EEOC within 300 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1); *see also National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 104-05, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). "An unlawful employment practice' includes various discrete acts such as 'termination, failure to promote, denial of transfer, or refusal to hire.'" *Roney v. Illinois Dep't of Transp.,* 474 F.3d 455, 460 (7th Cir. 2007); 42 U.S.C. § 2000e-2(a). "If a plaintiff does not file a charge concerning a discrete act of discriminatory conduct within 300 days of its occurrence, his claim is time-barred and he may not recover." *Roney,* 474 F.3d at 460. The period for filing an EEOC charge begins to run from the date the employee becomes aware of the adverse employment action. *See Delaware State Coll. v. Ricks,* 449 U.S. 250, 256-58, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980); *Stepney v. Naperville Sch. Dist.,* 203 392 F.3d 236, 240 (7th Cir. 2004) (300 day limitations period begins when employment decision communicated to employee).

In the previous summary judgment order, the court concluded that

> Defendants' timeliness argument is premised upon the notion that Lynch alleges that she suffered three discrete adverse employment actions: the "lowball" offer of 1%, the subsequent offer of 3.5%, and the rescinding of all offers of ownership. But this is not Plaintiff's theory of the case. The EEOC claims that the April 10 letter, in which Defendants rescinded all offers of ownership, is the adverse employment action that gives rise to this claim. Defendants do not dispute (for present purposes, at least) that Lynch received the letter rescinding all offers of ownership on April 16, 2001 and that she filed a charge with the EEOC less than 300 days after the receipt of the letter.
>
> Defendants maintain that the April 10 letter was not an adverse employment action because once Lynch suggested that she should receive a higher percentage, she rejected the 3.5% offer, and consequently, the April 10 letter did not rescind anything. However, there is a triable issue on whether the contract negotiations were ongoing such that the alteration of the "terms, conditions and privileges" of Lynch's employment had not yet occurred. Lynch maintains that after the meeting at which Lynch suggested she should receive more, Sullivan told Lynch that he would reconsider Defendants' offer. This alleged promise led Lynch to believe that she was still involved in active contract negotiations with Defendants. This evidence, if credited by the jury, would indicate that the change in the "terms, conditions, and privileges" of Lynch's employment did not occur until Lynch received the April 10 letter, in which Defendants made a final decision that "the ownership relationship has not worked out."
>
> Defendants argue that Lynch cannot "extend the date of an alleged discriminatory act by talking about it." But the clock does not start running at the time of the first discriminatory act of any sort—it runs from the point that the employee is aware that the "terms, conditions, and privileges" of her employment relationship have been materially altered. *See*, *e.g.*, *Ricks*, 449 U.S. at 256-58.

(R. 24-1, Mem., Op., & Order, at 11-12.) (internal record citations omitted).

The Court's earlier decision is the law of the case. *See Minch v. City of Chicago,* 486 F.3d 294, 301 (7th Cir. 2007). "[T]he law of the case doctrine embodies the notion that a court ought not to re-visit an earlier ruling in a case absent a compelling reason, such as manifest error or a change in the law, that warrants re-examination." *Id.*; *see also Analytical Eng'g, Inc. v. Baldwin Filters, Inc.,* 425 F.3d 443, 454 (7th Cir. 2005) ("The law of the case doctrine is a rule of practice which recited that when an issue is once litigated and decided, that should be the end

7

of the matter."). The law of the case doctrine applies when a case is reassigned from one judge to another. *See Minch,* 486 F.3d at 301. Specifically, "[i]n situations where a different member of the same court re-examines a prior ruling, 'the law of the case doctrine ... reflects the rightful expectation of litigants that a change of judges midway through a case will not mean going back to square one.'" *Id.* (citations omitted). The Court will only reexamine the earlier decision if that decision is clearly erroneous, there is a change in the law, or if the decision constitutes a manifest injustice. *See id.*; *Moriarty v. Svec,* 429 F.3d 710, 723 (7th Cir. 2005).

Defendants do not discuss the law of the case doctrine, but argue that additional discovery has revealed that there were no on-going negotiations regarding Lynch's ownership interest. Not only is Defendants' argument conjecture based on one comment Lynch made at her deposition, but it does not establish that the Court's earlier ruling was clearly erroneous, would amount to a manifest injustice, or that there has been a change in the law. *See Minch,* 486 F.3d at 301. Accordingly, the Court will not revisit this issue.[2]

## II.  Pregnancy Discrimination Claim

During her employment with MEA, Lynch had three children. The EEOC and Lynch maintain that Defendants improperly considered Lynch's pregnancies and possible future pregnancies in denying her equal terms and conditions of employment. Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or

---

[2] Because the Court will not revisit Defendants' timeliness arguments, the Court need not address the EEOC's contention that Title VII's time limitations should be equitably tolled based on the Seventh Circuit decision in *Kephart v. Institute of Gas Tech.,* 581 F.2d 1287, 1289 (7th Cir. 1978) (failure to post notice advising employees of ADEA's existence sufficient equitable grounds for tolling limitations period).

8

privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Pregnancy Discrimination Act of 1978 "amends Title VII to define discrimination 'because of sex' to include discrimination 'because of or on the basis of pregnancy, childbirth, or related medical conditions.'" *Griffin v. Sisters of St. Francis, Inc.*, 489 F.3d 838, 842 (7th Cir. 2007) (quoting 42 U.S.C. § 2000e(k)). "The statute further states that 'women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to work.'" *Id.* (quoting 42 U.S.C. § 2000e(k)) (emphasis deleted). The PDA addresses the stereotype that "women are less desirable employees because they are liable to become pregnant" and insures "that the decision whether to work while pregnant [is] reserved for each individual woman to make for herself." *Maldonado v. U.S. Bank*, 186 F.3d 759, 762 (7th Cir. 1999) (internal citations and quotations omitted). "Nonetheless, under the PDA, employers are not required to give pregnant women special treatment; they must only treat them the same as all other employees." *Id.* at 762-63.

As with other Title VII claims, Lynch may prove intentional pregnancy discrimination through either the direct method of proof or indirect method of proof as originally set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973). *See Venturelli v. ARC Cmt'y Serv., Inc.,* 350 F.3d 592, 599 (7th Cir. 2003); *Maldonado*, 186 F.3d at 763. Here, Lynch contends that she can establish intentional discrimination under both the direct and indirect methods of proof. The Court turns to Lynch's arguments under the direct method of proof because they are dispositive. As the Seventh Circuit teaches:

> Under the direct method, there are two types of permissible evidence. First, there is direct evidence, or evidence that, if believed by the trier of fact, would prove

> the fact in question without reliance on inference or presumption. Direct evidence essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus. For obvious reasons, we rarely encounter direct evidence. The second type of evidence permitted under the direct method is circumstantial evidence, or evidence that allows a jury to infer intentional discrimination by the decision-maker.

*Venturelli,* 350 F.3d at 599 (internal citations and quotations omitted). Moreover, under the direct method "circumstantial evidence must point directly to a discriminatory reason for the [employment] decision." *Ptasznik v. St. Joseph Hosp.,* 464 F.3d 691, 695 (7th Cir. 2006).

In support of her direct method argument, Lynch sets forth comments made by Masutti and Nazir during the March 22, 2001 board meeting where the Six Original Owners discussed the possibility of offering Lynch more than a 1% ownership interest. Specifically, Connor testified at his deposition that Masutti stated people like Lynch were not partnership material because they were not fully committed to the business, but were more interested in having children. (Pls.' Stmt. Facts ¶ 19, Ex. 78-2, Connor Dep., at 350-52.) Connor also testified that Nazir stated that he was not for Lynch becoming a partner because she missed work and had been pregnant. (*Id.* ¶ 20; Connor Dep., at 352.)

Defendants first argue that Connor's statements regarding Masutti's and Nazir's comments are inadmissible hearsay, and thus the Court cannot consider them on summary judgment. *See Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir. 1997) ("hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial."). Masutti's and Nazir's statements, however, fall within the hearsay exception of an admission by a party-opponent. *See* Fed.R.Evid. 801(d)(2)(D). Specifically, Masutti's and Nazir's statements fall within Rule 801(d)(2)(D) because they are about an issue within the subject matter of their agency, namely, their role as MEA owners, who made ownership

10

decisions. *See Keri v. Board of Trs. of Purdue Univ.,* 458 F.3d 620, 630 (7th Cir. 2006). Moreover, Nazir and Masutti were two of the actual decision makers considering the possibility of Lynch's ownership in MEA. *See id.* ("declarant must be involved in the decisionmaking process affecting the employment action involved."). Accordingly, these statements are admissible at summary judgment.

Defendants also argue that these statements were "stray comments" and that there was no causal nexus between the alleged statements and the challenged employment decisions. *See Scaife v. Cook County,* 446 F.3d 735, 741 (7th Cir. 2006); *see, e.g., Ptasznik v. St. Joseph Hosp.,* 464 F.3d 691, 695 (7th Cir. 2006). Masutti's and Nazir's alleged comments, however, occurred during a board meeting on March 22, 2001, when the owners were determining Lynch's potential ownership interest. Morever, the March 22, 2001 meeting took place only a few weeks before Daniel Sullivan's April 10, 2001 letter extinguishing the 3.5% ownership interest offer and discontinuing Lynch's role as Assistant Medical Director at St. Joseph's emergency room. Unlike the plaintiff in *Ptasznik* – who could not pinpoint when the alleged discriminatory comments took place except that they were approximately six months before her termination – Lynch has set forth evidence that Masutti's and Nazir's comments occurred ***during*** the actual decision making process of her possible ownership interest and only weeks before Defendants discontinued her role as Assistant Medical Director and extinguished their 3.5% offer. *See Ptasznik,* 464 F.3d at 695. This evidence points directly to the alleged discriminatory reason for the employment actions – Lynch's pregnancies. *See id.*

Thus, viewing the facts in Lynch's favor – as the Court is required to do at this procedural posture – Lynch has raised a genuine issue of material fact for trial that Defendants

11

intentionally discriminated against her based on her pregnancies and possible future pregnancies under the direct method of proof. Because Lynch has raised a genuine issue of material fact under the direct method of proof, the Court need not address the parties' arguments under the indirect method of proof. *See Phelan v. Cook County,* 463 F.3d 773, 789 n.2 (7th Cir. 2006).

## III. Constructive Discharge

Lynch also alleges that she was constructively discharged because when the MEA owners revoked their partnership offer and took away her Assistant Medical Director position, she was forced to resign. *See E.E.O.C. v. University of Chi. Hosp.,* 276 F.3d 326, 331 (7th Cir. 2002) ("Constructive discharge, like actual discharge, is a materially adverse employment action."). Defendants, on the other hand, argue that there is no issue of material fact relating to Lynch's constructive discharge claim, and thus they are entitled to summary judgment as to this alleged adverse employment action.

"To establish a claim for constructive discharge, a plaintiff must prove that unlawful discrimination made her working conditions so intolerable that a reasonable person would be forced to resign." *Boumehdi v. Plastag Holdings, LLC,* 489 F.3d 781, 789 (7th Cir. 2007); *see also Hunt v. City of Markham, Ill.,* 219 F.3d 649, 655 (7th Cir. 2000) ("The term 'constructive discharge' refers to the situation in which an employer, without firing an employee, makes his working conditions so miserable that it drives him to quit."). In general, most constructive discharge cases arise in the context of a hostile work environment where a plaintiff must establish that her working conditions were more egregious than the already high standard for hostile work environment claims. *See, e.g., Boumehdi,* 489 F.3d at 789; *see also Bannon v. University of Chi.,* 503 F.3d 623, 630 (7th Cir. 2007).

Nonetheless, establishing an egregiously hostile work environment is "not the only method of demonstrating constructive discharge." *E.E.O.C. v. University of Chi. Hosp.,* 276 F.3d at 332. More specifically, "[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge." *Id.* The Seventh Circuit later explained the reasoning behind this sentence:

> This sentence generalizes from a situation that met the normal standard: an employee arrived at work only to find that her office had been turned into a storage area, her belongings had been packed up, and her services were no longer wanted. We held that failure to sit in the corridor while waiting for someone to say "you have been fired" did not preclude an employment-discrimination suit. Just so when a professional employee is relegated to menial tasks and the employer makes it clear that no better treatment can be hoped for.

*Cigan v. Chippewa Falls Sch. Dist.,* 388 F.3d 331, 333 (7th Cir. 2004). Based on these facts, the Seventh Circuit concluded that "[t]his environment, in which her employer made reasonably clear to her that she had reached the end of the line – where 'the handwriting [was] on the wall' and the axe was about to fall, could have indeed been to a reasonable employee unbearable." *E.E.O.C. v. University of Chi. Hosp.,* 276 F.3d at 332 (quoting *Lindale v. Tokheim,* 145 F.3d 953, 956 (7th Cir. 1998)).

Here, evidence in the record establishes that while the owners took away Lynch's job position as Assistant Medical Director and revoked their ownership offer, they offered her two opportunities to stay on as an emergency room physician. (Defs.' Stmt. Facts ¶¶ 48, 49.) In addition, Daniel Sullivan specifically stated in his April 10, 2001, letter that Lynch was "obviously welcome to stay at St. Joes in a full or part time capacity and we hope that you do." (*Id.*; Defs.' Ex. 30.) Under these circumstances, Lynch's working conditions were not so

13

intolerable that a reasonable person in her position would have felt compelled to resign. *See Pennsylvania State Police v. Suders,* 542 U.S. 129, 141, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004); *see also Lindale,* 145 F.3d at 956 ("we cannot see how a reasonable jury could find that the failure to promote [plaintiff] made her working conditions intolerable."). Moreover, Lynch "was not turned out of her office or given tasks demeaning to her education and accomplishments." *Cigan,* 388 F.3d at 333. Finally, Lynch's allegations that she was treated with disdain and the St. Joseph work environment was "toxic" do not save the day because these statements are unsupported by her citations to the record.

## IV. Damages

Next, Defendants argue that Lynch failed to mitigate her damages. *See Gaffney v. Riverboat Serv. of Ind., Inc.,* 451 F.3d 424, 460 (7th Cir. 2006) ("because the lack of mitigation is an affirmative defense, the burden of proof for this issue falls on the employer."). As the Seventh Circuit instructs:

> A Title VII victim is presumptively entitled to full relief. Once a plaintiff has established the amount of damages she claims resulted from her employer's conduct, the burden of going forward shifts to the defendant to show that the plaintiff failed to mitigate damages or that damages were in fact less than the plaintiff asserts. To establish the affirmative defense of a plaintiff's failure to mitigate damages, the defendants must show that: (1) the plaintiff failed to exercise reasonable diligence to mitigate her damages, and (2) there was a reasonable likelihood that the plaintiff might have found comparable work by exercising reasonable diligence.

*Hutchison v. Amateur Elec. Supply, Inc.,* 42 F.3d 1037, 1044 (7th Cir. 1994) (internal citations omitted). Not only is there a factual dispute whether Lynch exercise reasonable diligence to mitigate her damages, but Defendants' bare-boned argument does not fulfill their burden of establishing the second requirement, namely, that there was a reasonable likelihood that Lynch would have found comparable work. As such, the Court denies Defendants' motion as to this

14

affirmative defense.

Defendants also argue that although equitable damages are recoverable under Title VII, *see* 42 U.S.C. § 2000e-5(g), "[t]here are no equitable grounds for ordering Defendants to extend ownership to Lynch; neither are there equitable grounds for ordering the payment of money damages in lieu of ownership" because Lynch rejected the 3.5% ownership offer. (R. 64-1, Defs.' Summ. J. Mem., at 15.) Defendants, however, fail to cite legal authority in favor of their argument or develop the facts supporting their claim. Without more, Defendants are not entitled to a judgment as a matter of law as to this issue. *See Fowler v. Caremark RX, L.L.C.,* 496 F.3d 730, 743 (7th Cir. 2007) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are not supported by pertinent authority, are waived.) (citation omitted).

Finally, Defendants argue that under the facts of the case, an ownership interest is neither backpay nor front pay. As such, Defendants contend that any claimed lost ownership interest must be considered compensatory damages, and thus subject to the statutory cap as set forth in 42 U.S.C. § 1981a(b)(3). *See Pals v. Schepel Buick & GMC Truck, Inc.,* 220 F.3d 495, 499 (7th Cir. 2000) ("neither back nor front pay counts against a maximum award of compensatory damages under § 1981a(b)(3)."). Defendants give no cogent reason ***why*** the ownership interest at issue cannot be remedied by backpay or front pay. Without more, there is no basis to grant judgment as a matter of law on this issue.

## **CONCLUSION**

For these reasons, the Court grants in part and denies in part Defendants' Motion for Summary Judgment brought pursuant to Federal Rule of Civil Procedure 56(c).

Dated: January 29, 2008

ENTERED

_____
**AMY J. ST. EVE**
**United States District Court Judge**